**DAVIS & SONS, INC.,**
Plaintiff–Appellee,

v.

**GULF OIL CORPORATION,**
Defendant–Appellant.

No. 90–3035.

United States Court of Appeals,
Fifth Circuit.

Dec. 14, 1990.

Rehearing and Rehearing En Banc Denied
Jan. 16, 1991.

Edith Brown Clement, Thurl Stalnaker, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant-appellant.

James R. Sutterfield, Carmouche, Gray & Hoffman, New Orleans, La., for plaintiff-appellee.

Before RUBIN, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Whether a contract is or is not maritime in nature is a quotidian issue whose resolution is governed by no broad rubric discernible from the numerous decided cases. Once again, therefore, we examine a contract for services associated with offshore oil and gas production to determine wheth-

er its validity and interpretation are governed by maritime or state law. The parties had entered into what they called a "blanket" contract, the terms of which were to be incorporated into agreements for actual services they contemplated. These later agreements were periodic work orders calling for the performance of specific services. The district court held that since the principal obligation of the blanket contract was non-maritime in nature, an indemnity provision contained in it was subject to state law, which rendered the provision invalid. Because we find that the blanket contract was inchoate, was amended and supplemented by the subsequent work orders, and the work order in question required the performance of a maritime obligation, we hold that maritime law applies. We, therefore, reverse and remand.

## I.

In 1981, Davis & Sons, Inc. entered into Master Service Agreement No. 05–114 with Gulf Corporation to provide "labor and general contracting services for the Eastern offshore area onshore and offshore facilities." The document did not further specify any work to be performed by Davis for Gulf. This blanket contract included an indemnity clause requiring Davis to "protect, indemnify and save Gulf harmless from and against all claims, demands and causes of actions, suits or other litigation ..." that might arise out of the contractual relationship.

Pursuant to the terms of this document, and as contemplated by the parties, Gulf from time to time issued work orders directing Davis to provide labor to perform maintenance work in Black Bay Field, an area in Plaquemines Parish, Louisiana, leased by Gulf, in which Gulf operated approximately 150 wells producing natural gas and crude oil. The Black Bay Field is located primarily beneath open water, consisting of lakes, bays, and canals with a limited amount of marshland and virtually no firm ground. After a well has been completed, the wellhead is surrounded by a work platform or grating approximately

seven feet in diameter. Maintenance of the wellheads, flow lines, storage tank batteries, and related production equipment is performed primarily through the use of self-propelled work barges each of which is equipped with spuds to anchor the barge in a given work location.

Pursuant to work orders issued weekly, Davis supplied labor for two barge crews and two individual pumpers to work in Black Bay Field during 1981 and 1982. The tasks performed by the contract labor included acting as crew for the vessels. Mark P. Brenaman, a Davis employee, was assigned to work as a "pusher" aboard Barge No. 11171 in Black Bay Field, beginning in January 1981. The crew of Barge 11171 were land-based; the barge had neither sleeping quarters nor bathroom facilities. The barge had spuds but no jack-up facilities, so any work on the barge was done either while it was afloat or spudded down adjacent to a platform.

Brenaman's primary duty was to supervise the Davis employees. Barge 11171 went on daily routine maintenance runs wherever the services of the Davis employees were needed within Black Bay Field to make repairs, lay pipe, and work on flow lines; it also transported chemicals and supplies. Most of the service work was performed on the barge itself since the wellheads did not provide adequate work space. The Davis employees were also responsible for maintenance of the barge, which included: painting the quarters, crane and other equipment; inspecting and repairing the engines and cranes; and operating and navigating the barge. Although Brenaman had no captain's license, he supervised all of these functions.

On July 2, 1982, while assigned to work on Barge 11171, Brenaman drowned. The precise circumstances of his death are unknown. At the time of his death, Davis's employees were assigned to Barge 11171 pursuant to service order 728113, covering the period from June 28—July 4, 1982. The order provided only: "Vendor: Davis; Service Description: Labor Gang 11171."

On the day of the accident, Barge 11171 was spudded down adjacent to a fixed plat-

form. The crew were all on the barge, building a walkway to be placed on a tank battery, filling a pollution tank with water, and checking the tank for leaks. Brenaman was both supervising their work and fitting paneling for an office being built on the barge. He left this area and several hours later was discovered to have drowned in nearby waters.

Brenaman's representatives sued Davis and Gulf. After that suit had been settled, Davis filed suit for a declaratory judgment that Louisiana law governs the interpretation of the contractual indemnity provision in the blanket contract and that the Louisiana Oilfield Indemnity Act [1] voids that provision. Gulf counterclaimed that maritime law applies to the interpretation of the indemnity clause and that it is therefore valid. Gulf and Davis brought cross-motions for summary judgment. The district court granted Davis's motion and denied Gulf's motion, holding that this court's analysis in *Thurmond v. Delta Well Surveyors* [2] required a finding that the blanket contract was non-maritime in nature.

## II.

The attempt to determine whether a contract, particularly one linked to offshore gas and oil production, is governed by state or maritime law has led to much confusion. For those looking for a bright line delineating the boundary between maritime and non-maritime contracts, our previous cases offer little assistance; some assert that "oil and gas drilling on navigable waters aboard a vessel is recognized to be mari-

time commerce," [3] or hold that a turnkey contract to drill an offshore well [4] or a contract to furnish a casing crew to a submersible drilling barge [5] are maritime in nature, while others state that there is nothing inherently maritime about the activities involved in offshore oil production. [6] These apparent inconsistencies, however, can be traced to the highly fact-specific nature of the inquiry necessary to determine whether a contract is governed by maritime law. While we can discern no single method of analysis in the many cases addressing this subject, they do appear to be based on a fairly consistent underlying approach, which we now articulate.

■ If, as in this case, the contract consists of two parts, a blanket contract followed by later work orders, the two must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions. The blanket contract is not of itself complete and calls for no specific work. The actual contract between the parties therefore consists of the blanket agreement as modified by the later work order.

A contract may either contain both maritime and non-maritime obligations or, as in the Gulf–Davis blanket agreement, contemplate future detailed contracts having different characteristics. If separable maritime obligations are imposed by the supplementary contracts, or work orders, these are "maritime obligations [that] can be separately enforced [in admiralty] without

1. La.Rev.Stat.Ann. § 9:2780 (West 1990).

2. 836 F.2d 952 (5th Cir.1988).

3. *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir.1986).

4. *Lewis v. Glendel Drilling Co.*, 898 F.2d 1083 (5th Cir.1990).

5. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir.1981); *see Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge*, 424 F.2d 684 (5th Cir.), *cert. denied, Ocean Drilling & Exploration Co. v. Signal Oil & Gas Co.*, 400

U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); *Halliburton Co. v. Norton Drilling Co.*, 302 F.2d 431 (5th Cir.1962), *cert. denied*, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963).

6. *Houston Oil & Minerals Corp. v. American Int'l Tool Co.*, 827 F.2d 1049 (5th Cir.1987), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1031, 98 L.Ed.2d 995 (1988); *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132 (5th Cir.1981), *cert. denied Valero Energy Corp. v. Sohyde Drilling & Workover, Inc.*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *see Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985).

prejudice to the rest,"[7] hence subject to maritime law.[8] If, therefore, an injury occurs in the performance of a separable maritime obligation even though it is provided for by an initial blanket contract that is principally non-maritime, the complete contract is nevertheless subject to maritime law.[9]

■ Whether the blanket agreement and work orders, read together, do or do not constitute a maritime contract depends, as does the characterization of any other contract, on the "nature and character of the contract,"[10] rather than on its place of execution or performance. "A contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law."[11] What constitutes maritime character is not determinable by rubric. The Supreme Court has resorted to the observation that a contract is maritime if it has a "genuinely salty flavor."[12] As Gilmore and Black interpret the jurisprudence, "[t]he resultant conception of our admiralty jurisdiction has been one of fairly complete coverage of the primary operational and service concerns of the shipping industry, with a few anomalous exceptions."[13]

■ Determination of the nature of a contract depends in part on historical treatment in the jurisprudence and in part on a fact-specific inquiry. We consider six factors in characterizing the contract: 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?

### III.

■ By its own terms, the blanket agreement between Gulf and Davis provides for services for "onshore and offshore facilities." Davis asserts that approximately 70% of the labor provided under this contract was land-based, the contract's principal obligation was demonstrably non-maritime, and the holding of *Thurmond v. Delta Well Surveyors*[14] therefore mandates the application of state law. Gulf contests both the evidentiary and legal basis of this assertion. Even if we assume Davis's factual assessment to be correct, however, this does not foreclose the application of maritime law to the work orders applicable to some or all of the 30% vessel-based services as maritime obligations rendered pursuant to the final contract for these services. The choice of state law in *Thurmond* did not rest solely on the non-maritime nature of the principal obligation of the preliminary blanket agreement to provide wireline services for offshore wells, but also on the fact that the suit arose out of the performance of that non-maritime obligation.[15]

On the day of his death, Brenaman and his crew were working pursuant to weekly service order 728113, which specifically assigned them to Barge 11171. This service order contained no further details of their assigned work. The workers' time sheets

---

7. *Compagnie Francaise De Navigation A Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir.1927), quoted in *Hale v. Co–Mar Offshore Corp.*, 588 F.Supp. 1212, 1217 (W.D.La.1984).

8. *Hale*, 588 F.Supp. at 1215; *Home Ins. Co. v. Garber Industries, Inc.*, 588 F.Supp. 1218 (W.D.La.1984); *Heath v. Superior Oil Co.*, 617 F.Supp. 33 (W.D.La.1985).

9. *Lefler v. Atlantic Richfield Co.*, 785 F.2d 1341 (5th Cir.1986); *Hale*, 588 F.Supp. at 1215.

10. *North Pacific S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125, 39 S.Ct. 221, 223, 63 L.Ed. 510 (1919); *Kossick v. United*

*Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

11. E. Jhirad, A. Sann, B. Chase, & M. Chynsky, *Benedict on Admiralty*, § 182 (1988).

12. *Kossick*, 365 U.S. at 742, 81 S.Ct. at 894.

13. G. Gilmore & C. Black, The Law of Admiralty 22 (2d ed. 1975).

14. 836 F.2d 952 (5th Cir.1988).

15. *Id.* at 955.

from June 28—July 4, however, indicate that during that week Brenaman's crew actually repaired leaks on wells and tanks, repaired and replaced flowlines, transported materials, and built a walkway. To fulfill these tasks, the crew of Barge 11171 travelled aboard the barge from one job site to another within Black Bay Field and performed their work predominantly aboard the barge. The particular nature of the terrain and production equipment involved required a special purpose vessel like Barge 11171 that could function as a mobile work platform. Its transportation function was more than "merely incidental" to its primary purpose of serving as a work platform.[16] The mission of this vessel, therefore, was to serve as a mobile maintenance unit in Black Bay Field, and "in the light of the function or mission of the special structure to which they were attached, [its crew] served in a capacity that contributed to the accomplishment of its mission in the same way that a surgeon serves as a member of the crew of a floating hospital."[17] The work done by the crew of Barge 11171 was inextricably intertwined with maritime activities since it required the use of a vessel and its crew.

Brenaman's principal work was to supervise Davis's employees in the accomplishment of the vessel's mission. He had been assigned to Barge 11171 for more than eighteen months and performed a substantial part of his work on the barge itself. He was, in effect, a Jones Act seaman with regard to Barge 11171.[18] At the time of his death, he was engaged in his principal activity of overseeing Davis's employees who in effect constituted the crew of the vessel, as well as temporarily helping to build an office on board.

We hold, therefore, that the entire agreement between Davis and Gulf to provide labor for Barge 11171 for the period June 28 to July 4, 1982, constitutes a maritime contract and that the validity of the indemnity provision of the blanket contract between Davis and Gulf must be assessed according to maritime law. We REVERSE the district court's grant of summary judgment to Davis and its denial of summary judgment to Gulf, and REMAND for further action consistent with this opinion.

---

**16.** *Sharp v. Johnson Bros. Corp.*, 917 F.2d 885 (5th Cir.1990); *Brunet v. Boh Bros. Construction*, 715 F.2d 196, 198 (5th Cir.1983).

**17.** *Offshore Co. v. Robison*, 266 F.2d 769, 776 (5th Cir.1959).

**18.** *Id.; Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067 (5th Cir.1986).