Barbara **HOLLIER**, et al.

v.

**UNION TEXAS PETROLEUM CORP.**, et al.

**Civ. A. No. 89–0657.**

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

June 3, 1991.

Mark A. Lowe, Liskow & Lewis, Lafayette, for defendant and third party plaintiff, Union Texas Petroleum Corp.

Gary P. Kraus, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, for third party defendants, Petroleum Personnel, Inc. and Lloyd's Underwriters at London.

## OPINION

PUTNAM, Senior District Judge.

This case arises out of an accident occurring on the Outer Continental Shelf off the coast of Louisiana. The parties have filed an agreed Statement of Undisputed Facts and the matter is submitted for decision on briefs. The undisputed facts are as follows:

1. G & B Marine Transportation, Inc. ("G & B") was the owner/operator of the M/V CELESTE.

2. On January 19, 1989, David Hollier was a passenger aboard the M/V CELESTE, which vessel was chartered by Union Texas Petroleum Corporation ("UTP").

3. At approximately 3:00 a.m. on January 19, 1989, David Hollier attempted to transfer from the M/V CELESTE to the UTP Vermilion 104 "A" platform in the Gulf of Mexico, on the Outer Continental Shelf, offshore Louisiana.

4. David Hollier suffered a fatal accident when he fell into the water between the vessel and the platform.

5. David Hollier was survived by his widow, Barbara Hollier, and his son, Anthony David Hollier, who is in the custody of Hollier's former wife, Vickie Lukaszeski.

6. At all times pertinent John Martin, Douglas Miguez, John Polk and Tommy Hughes were employees of UTP.

7. At all times pertinent the platform in question was operated by UTP.

8. At all times pertinent Jeffrey Griffin, David Burrus, and John Brady were employees of G & B.

9. At all times pertinent Petroleum Personnel, Inc. ("PPI") was the employer of David Hollier, Hayward Sedatol and Todd Landry.

10. At times pertinent there was in full force and effect Purchase Order No. H–61266, executed by and between UTP and PPI.

11. PPI furnished UTP with a Certificate of Insurance dated June 1, 1988, certifying that Lloyd's Underwriters at London provided coverage for any indemnity obligations which were contractually assumed by PPI.

12. UTP produces gas and/or oil at the Vermilion Block 104 "A" platform.

13. David Hollier, the decedent, performed the majority of his work on platforms operated by UTP. He performed a small amount of work on the vessel, related to his work on the platform.

14. The UTP and PPI operators in the field often rode but seldom slept on the vessels.

15. A deliverability test had been ordered by one of UTP's gas purchasers to last for fourteen days.

16. Martin and Hollier were to eat, sleep and live aboard the M/V CELESTE for seven days in order that they could periodically check on the well located on the platform in furtherance of the deliverability test.

17. As the Vermilion 104 "A" platform did not have a helicopter pad, vessels were required for transporting personnel to and from the platform.

18. The UTP Vermilion 104 "A" platform is a small, unlit and unmanned structure.

19. The UTP and PPI operations personnel in the field slept on the platforms which had living quarters the majority of their time in the field.

20. The lights on the stern of the vessel cabin were necessary to illuminate

the landing areas during such personnel transfers at night.

21. The crew of the M/V CELESTE on the day of the incident consisted of John N. Brady (deckhand), Jeffrey Griffin (captain), David Burrus (captain), and Bruce Manning (deckhand).

22. The deckhand assists in vessel transfers by retrieving the swing rope for the passengers.

23. John Martin and David Hollier transferred to the M/V CELESTE from the M/V EMILY C on the previous day, January 18, 1989.

24. The EMILY C is another vessel owned and operated by G & B which was also chartered to UTP at the time.

25. The mother platform, Vermilion 237, is approximately fifty miles from the Vermilion 104 "A" platform where the accident occurred.

26. The operators are trained by Dick Keelan, the UTP safety supervisor, in the proper method in which to complete vessel transfers and in water survival courses.

27. UTP paid a total of $60,000.00 in settlement of the main demand.

28. UTP incurred reasonable attorney fees, costs and expenses of $68,-323.55 in defending the main demand.

■ As the court said in *Davis & Sons, Inc. v. Gulf Oil Corporation*, 919 F.2d 313 (5th Cir.1990):

"Whether a contract is or is not maritime in nature is a quotidian issue whose resolution is governed by no broad rubric discernible from the numerous decided cases ..."

In that case the court reviewed the jurisprudence in this area of the law and listed the six factors considered to be controlling in making the determination of whether or not the work done under an oil well service contract embracing onshore and offshore drilling and production activities is or is not maritime in character.[1] Here the work was being done pursuant to a work order issued by Union Texas Petroleum Corporation ("Union") to Petroleum Personnel, Inc. ("PPI"), which called for the latter to furnish "... all necessary tools, equipment, supplies, labor and supervision to perform work as follows: operator and roustabout services required for various offshore production platforms", among which is the Vermilion Block 104 "A" platform, where the fatal accident occurred. Union, having settled the claims of Mrs. Hollier and the remaining survivors of David Hollier, now claims indemnity from PPI under maritime law. PPI contends the Louisiana Oilfield Indemnity Act, L.R.S. 9:2780 (LOIA) applies to nullify the indemnity portion of the contract as well as the provisions thereof calling for insurance to hold Union harmless from such claims. The master service contract, providing general terms and conditions for purchase order No. H-61266 provides for the application of Texas law to the contract. Under the Texas Oilfield Indemnity Act, the contractor is relieved of his indemnity obligations, but the insurance carrier covering such incidents may be held liable.[2]

Applying the Davis factors to the case before us, we find from the statement of undisputed facts and the stipulations entered into on oral argument held on May

---

1. The Court said: "Determination of the nature of a contract depends in part on historical treatment in the jurisprudence and in part on a fact-specific inquiry. We consider six factors in characterizing the contract: 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?" *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir.1990). See also *Domingue v. Ocean Drilling and Exploration Co., et al.*, 923 F.2d 393 (5th Cir.1991).

2. Work order No. 4-61266. Purchase Order General Terms and Conditions, §§ 13, 15, 16; and Texas Civil Practice & Remedies Code, Ch. 127, § 127.001 et seq., especially § 127.005 Insurance Coverage.

23, 1991, that decedent Hollier was furnished to UTP as an operator pursuant to the purchase order dated May 28, 1988 mentioned above, and was directed by UTP as part of his job to conduct a deliverability test on a gas well flowing on Vermilion Block Platforms 104 "A" off the Louisiana coast. The work he was to perform was not inherently maritime in nature and would have been the same whether conducted onshore or offshore. It is a function related solely to the production of oil and gas and under the first Davis factor we would ordinarily say it is not maritime employment. The work actually done by Hollier required him to live aboard the M/V Celeste and to transfer from the vessel to the platform periodically to check the gas flow from the well in question. To accomplish this he was assigned to the M/V Celeste by UTP for living accommodations.[3] The vessel was tied up to the platform to give him access to the wellhead and gauges twenty-four hours a day. The work required transfers from the vessel to the platform at regular intervals, use of the vessel's lights for illumination and a place to do minor paper work after reading the gauges and returning on board. The accident occurred at approximately 3:30 a.m. while Hollier was transferring from the M/V Celeste to the platform. His death resulted from drowning and was covered under the Death On the High Seas Act, 46 U.S.C.A.App. § 761, et seq. Our findings as set forth above answer factors two, three, five and six of the Davis tests (Supra No. 1).

The fourth factor—to what extent did the work being done relate to the mission of the vessel—does not aid UTP. The M/V Celeste was owned by G & B Marine Transportation, Inc. ("G & B"), and was under charter to UTP. It was a work boat for transportation of personnel and supplies to various worksites on platforms and oil production facilities owned by UTP on the Outer Continental Shelf. At the time of the accident the vessel was moored to the platform to provide living quarters for David Hollier and the PPI crew, and to this extent the presence of the PPI personnel on board as passengers contributed to the function of the vessel, but not in an operational sense. We conclude that other than providing the reason for the M/V Celeste to be tied up to this particular platform so Mr. Hollier could do his work on the well and its small work platform, his work did not contribute to the mission of the vessel or convert the nature of his employment to maritime work. Maritime law does not apply.[4]

■■■ UTP argues, and we agree, that the choice of law provisions of the contract set out below, govern the indemnity obligations if maritime law does not apply. The contract is clear and unequivocal,[5] and the law of Texas, not Louisiana, applies. See *Restatement, (Second), Conflict of Laws,* § 187. Texas is the state of the principal office and place of business for UTP and as such it has a substantial relationship to the parties. *Hale v. Co–Mar Offshore Corp.,* 588 F.Supp 1212, 1215 (W.D.La.1984). There is, therefore, a reasonable basis for the choice of Texas law in this case. Applying that law we find that mutual indemnity agreements supported by insurance covering the indemnity obligations are valid and enforceable. Such is the case here. *Texas Civil Practice &*

---

**3.** See stipulations in open court made on May 23, 1991.

**4.** See: *Domingue v. Ocean Drilling and Exploration Co.,* 923 F.2d 393 (5th Cir.1991); *Thurmond v. Delta Well Surveyors,* 836 F.2d 952 (5th Cir. 1988). Cf. *Lewis v. Glendel Drilling Co.,* 898 F.2d 1083, 1088 (5th Cir.1990). The second alternative and variation thereof suggested by the Lewis court presents a more workable solution to the problem, given the wide range covered by offshore service contracts in the oil industry.

**5.** Paragraphs 15 and 16 of the contract read as follows:

"15. **GOVERNING LAW.** This order shall be governed by the laws of the State of Texas, including the Texas Uniform Commercial Code. Unless otherwise indicated by the context, this order is defined in the Texas Uniform Commercial Code, the definition contained therein is controlling as to the meaning of the term.

16. **FORUM.** The parties hereto agree to submit to the jurisdiction of the courts of the State of Texas in connection with any controversy arising hereunder."

*Remedies Code* §§ 127.001(2), 127.005(b). Judgment is, therefore, rendered in favor of UTP against the third party defendants herein as prayed for.

Judgment will not be entered until a formal decree has been prepared by the prevailing party and presented to the court, signed and filed. The attorneys representing UTP are directed to submit such a decree within ten (10) days of this date.