United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 29, 2005**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-30080

_____

BILLY HODA,

Plaintiff,

versus

ROWAN COMPANIES, INC., ET AL.,

Defendants;

ROWAN DRILLING CO., INC.,

Defendant-Third Party-Plaintiff-Appellee,

versus

GREENE'S PRESSURE TESTING AND RENTALS INC.;
ATLANTIC INS. CO.,

Third Party-Defendants-Appellants.

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before GARWOOD, JONES, and PRADO, Circuit Judges.

BY EDITH H. JONES:

This appeal requires us to sort once more through the
authorities distinguishing maritime and non-maritime contracts in
the offshore exploration and production industry. As is typical,
the final result turns on a minute parsing of the facts. Whether
this is the soundest jurisprudential approach may be doubted,

inasmuch as it creates uncertainty, spawns litigation, and hinders the rational calculation of costs and risks by companies participating in this industry. Nevertheless, we are bound by the approach this court has followed for more than two decades.

Billy Hoda, an employee of Appellant Greene's Pressure Testing and Rentals Inc. ("Greene"), was injured while working onboard the Rowan Gorilla II, a jack-up drilling rig owned by Appellee Rowan Drilling Co., Inc. and operating on the Outer Continental Shelf. Hoda sued Rowan, which filed a third party complaint against Greene and Atlantic Insurance Company for defense, indemnity, and additional assured status based on the parties' Master Service Agreement.[1] The indemnity provision required Greene to indemnify Westport and Westport's contractors, including Rowan, from claims by Greene's employees.

The corporate parties moved for summary judgment over the enforceability of the indemnity provision.[2] The Louisiana Oilfield Anti-Indemnity Act, applicable if the contract is "non-maritime," invalidates just such indemnity provisions.[3] On the other hand, if

---

[1] Greene's original contract was with Equitable Resources Energy Company, which changed its name to Equitable Production Company. Equitable Production Company later merged with Westport. The parties refer to the various contracts and work orders as being with Westport, however.

[2] Hoda settled, but the parties' contractual dispute was preserved.

[3] LA. REV. STAT. ANN. § 9:2780. Curiously, the parties only mention in passing the Master Service Agreement's choice of law clause (¶ 14), which stipulates the application of general maritime law, but "if maritime law is held inapplicable by a court of competent jurisdiction," then Texas law applies. Moreover, the contract calls solely for the performance of offshore services. Our conclusion that the contract is maritime is consistent with the contract.

the contract is a "maritime" agreement, federal maritime law does not bar enforcement of that provision.

Following a hearing on a developed but undisputed factual record, the district court concluded that the contract was maritime and granted Rowan's motion, requiring indemnification. Greene's timely appealed. We affirm.

## DISCUSSION

This court reviews a summary judgment de novo, using the same standards as the district court. Green v. Vermilion Corp., 144 F.3d 332, 334 (5th Cir. 1998). A careful description of the facts is a necessary predicate to further analysis.

The Master Service Agreement covered "hydrostatic testing, hydraulic torque wrench service, nut splitters, casing cutting, pipeline/production and miscellaneous rental tool equipment." With this agreement in place, Greene's performed under individual work orders. When Hoda tripped over hoses on the deck of the Gorilla II, he was engaged in torquing (or tightening) nuts on the blow-out preventers on Westport's wellhead.

The Greene's employees worked on the decks of the Gorilla II as there was no fixed platform at the wellhead. The torquing constituted part of a project to install and change blow-out preventers, a project accomplished in conjunction with Rowan personnel who operated the crane and other equipment on the rig. Greene's employees torqued down and torqued up the bolts on

3

the blow-out preventers as they were installed on or removed from the wellhead riser. Greene's exact work did not require the use of the vessel, her personnel or equipment, but Greene's would have had nothing to do had Rowan personnel not used the rig's equipment to set the blow-out preventers in place, align them, place the bolts on them, and place the nuts on the bolts for tightening (or performed the same functions in reverse order). Moreover, Greene's work was sequenced with and delayed by Rowan with gravel packing operations that Rowan was separately undertaking on the well.

The legal framework for determining whether a contract is maritime is set out in <u>Davis & Sons, Inc. v. Gulf Oil Corp.</u>, 919 F.2d 313 (5th Cir. 1990). Under <u>Davis</u>, there are two parts to the inquiry — an examination of the "historical treatment in the jurisprudence" and a six-factor "fact-specific inquiry." <u>Id.</u> at 316. In some circumstances, though not here, the historical treatment is clear enough to make the second part of the test "unimportant." <u>Demette v. Falcon Drilling Co., Inc.</u>, 280 F.3d 492, 500 (5th Cir. 2002). The six factors are:

(1) what does the specific work order in effect at the time of injury provide?

(2) what work did the crew assigned under the work order actually do?

(3) was the crew assigned to work aboard a vessel in navigable waters?

(4) to what extent did the work being done relate to the mission of that vessel?

4

> (5)  what was the principal work of the injured worker? and
>
> (6)  what work was the injured worker actually doing at the time of injury?

Davis, 919 F.2d at 316.  The maritime or non-maritime status of the contract ultimately depends on its "nature and character," not on its place of execution or performance.  Id.

No Fifth Circuit case has previously addressed whether torquing bolts on a blow-out preventer from a jack-up drilling rig used as a work platform constitutes a maritime contract.  Davis's initial reference to the "historical treatment in the jurisprudence," while inconclusive, is nonetheless suggestive, for present purposes.

Arguing by analogy, Greene's cites this court's decisions holding that contracts for wireline services performed on a partially drilled offshore oil and gas well are "distinctly" non-maritime, even when the services are partially performed from a special-purpose boat[4] or on a jack-up drilling rig.[5]  Domingue described a jack-up drilling rig as a mere work platform for the execution of the wireline services contract.  Domingue, 923 F.2d at 397.  This argument draws some force from the fact that the Supreme Court has rejected, albeit in a different context, this court's

---

[4]    Thurmond v. Delta Well Surveyors, 836 F.2d 952 (5th Cir. 1988).

[5]    Domingue v. Ocean Drilling & Exploration Co., 923 F.2d 393, 394 n.1 (5th Cir. 1991).  A wireline operation assists on partially drilled oil and gas wells and gathers relevant geophysical data.

5

earlier, expansive equation of offshore drilling with "maritime commerce." Herb's Welding, Inc. v. Gray, 470 U.S. 414, 105 S. Ct. 1421, 1426 (1985) (LHWCA did not cover injuries of oil and gas worker on a fixed production platform in state territorial waters). Beyond doubt, the torquing services Greene's provided pertain solely to oil and gas development and, in and of themselves, have nothing to do with traditional maritime activity or commerce.[6] Greene's relies on Dominque's statement that a "contract does not become maritime simply because the wireline services were performed aboard the drilling rig vessel. A specialty services contract related to oil and gas exploration and drilling takes on a salty flavor when [its] performance . . . is more than incidentally related to the execution of the vessel's mission." 923 F.2d at 396.

Rowan, for its part, broadly characterizes the Westport/Greene's contract as integral to and integrated with the activities of its specialty purpose vessel: by performing part of the mission of the vessel, Greene's contract is maritime. Rowan relies on two cases in which contracts to provide casing services on jack-up drilling rigs operating on the Outer Continental Shelf were deemed maritime. Demette, 280 F.3d 492; Campbell v. Sonat

---

[6]    See, e.g., Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co., 644 F.2d 1132, 1137 (5th Cir. 1981), in which this court observed that blow-out preventers are not connected with maritime activity. Sohyde's relevance, as a property damage tort case, to the interpretation of maritime/non-maritime contracts was, however, discounted in Dominque, 923 F.2d at 397 n.9. But cf. Thurmond, 836 F.2d at 956 (discussing Sohyde).

6

<u>Offshore Drilling, Inc.</u>, 979 F.2d 1115 (5th Cir. 1992).[7] <u>Campbell</u> furnishes the critical reasoning. Because the casing crew required the use of the rig's derrick and draw works to accomplish its tasks, the contract work was deemed "inextricably intertwined" with the "maritime activities" of the rig and its crew. <u>Campbell</u>, 979 F.2d at 1123, citing <u>Davis</u>, 919 F.2d at 317 (mission of "mobile maintenance vessel" was "inextricably intertwined with maritime activities").[8]

That the "jurisprudential history" alluded to in <u>Davis</u> cuts both ways is a trite observation.[9] This court's decisions have reflected the inherent tensions between the non-maritime nature and concerns of traditional oil and gas drilling and those of the salty locale in which such exploration often occurs. Greene's position is supported by cases in which agreements for self-contained oil and gas activities, that do not inherently depend on a vessel and crew, are held not to constitute maritime

---

[7] In <u>Corbitt v. Diamond M. Drilling Co.</u>, 654 F.2d 329, 332 n.1 (5th Cir. 1981), this court earlier held that federal maritime law controls construction of an indemnity clause in a purchase order for casing services.

[8] Rowan advances some other alleged connections of Greene's work to maritime activity that are wholly unpersuasive. These include the fact that Greene's personnel and equipment were loaded onto the <u>Gorilla II</u> by means of the vessel's cranes; that Greene's personnel remained onboard the rig for a couple of nights; and that the particular project involved a "repair" of the rig solely because the blow-out preventers, which were installed on the wellhead riser during drilling, were property of Rowan. The first two facts are descriptive, not analytical, and the third is disingenuous.

[9] <u>See, e.g.</u>, <u>Demette</u>, 280 F.3d at 502 (DeMoss, J., dissenting); <u>Davis</u>, 919 F.2d at 315 (attempt to determine whether contract linked to offshore gas and oil and production is maritime "has led to much confusion"); <u>Lewis v. Glendel Drilling Co.</u>, 898 F.2d 1083, 1087-88 (5th Cir. 1990) (suggesting en banc treatment).

7

contracts. In this case, however, the torquing of the blow-out preventers was not as independent and self-contained an activity as Greene's contends. "Even a contract for offshore drilling services that does not mention any vessel is maritime if its execution requires the use of a vessel." Demette, 280 F.3d at 500-01. As was noted above, the torquing up and torquing down of the blow-out preventer stacks was but a discrete function in a carefully orchestrated series of actions conducted by Rowan during the drilling of the well. Greene's services were "inextricably intertwined" with the activity on the rig, were dependent on Rowan's placement of the equipment on which Greene's employees worked, and could not be performed without the rig's direct involvement. The more analogous caselaw is found in Campbell and Demette and leans strongly toward finding a maritime contract.

This suggestion is confirmed by application of the specific Davis factors. The work order called for Greene's to torque up and torque down the blow-out preventer stacks, and Greene's crew performed their services aboard a vessel in navigable waters, in coordination with and deference to the rig's personnel. Hoda was injured while performing the specified work. The only one of the Davis factors plausibly in doubt is Factor no. 4, the question whether Greene's work was "related to the mission of the vessel." We conclude, paraphrasing Demette, that torquing up and torquing down blow-out preventers "is an integral part of drilling, which is the primary purpose of the vessel." 280 F.3d at 501.

This conclusion is not merely descriptive, but derives from the functional interrelationship of Greene's work with the rig.

It needs to be added that we do not accept Rowan's broad characterization whereby oil and gas services contracts are maritime whenever they contribute to the mission of the jack-up drilling rig. To do so would conflict with <u>Davis</u> and <u>Thurmond</u> and would potentially be at odds with <u>Herb's Welding</u>. Our ruling is, like others in this area, confined to the facts before us.

### CONCLUSION

For these reasons, the district court accurately applied this court's caselaw in concluding that the Greene's/Westport contract was on this occasion a maritime obligation. Consequently, the contract's indemnity provision is enforceable under general maritime law. The judgment of the district court is **AFFIRMED.**

9