**REVISED January 11, 2018**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 8, 2018

Lyle W. Cayce
Clerk

No. 16-30217

In Re: In the Matter of the Complaint of Larry Doiron, Incorporated as Owner and Operator of the Barge Pogo and M/V Billy Joe for Exoneration from or Limitation of Liability

LARRY DOIRON, INCORPORATED,

      Plaintiff – Appellee

ROBERT JACKSON,

      Intervenor Plaintiff – Appellee

v.

SPECIALTY RENTAL TOOLS & SUPPLY, L.L.P.; OIL STATES ENERGY SERVICES, L.L.C.; ZURICH AMERICAN INSURANCE COMPANY,

      Defendants – Appellants.

Appeal from the United States District Court
for the Western District of Louisiana

No. 16-30217

Before STEWART, Chief Judge, and JOLLY*, DAVIS**, JONES, SMITH, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON and COSTA, Circuit Judges.***

W. EUGENE DAVIS, Circuit Judge.

We took this case en banc to consider modifying the criteria set forth in *Davis & Sons, Inc. v. Gulf Oil Corp.* for determining whether a contract for performance of specialty services to facilitate the drilling or production of oil or gas on navigable waters is maritime.[1] After briefing and argument, the Court has decided to adopt a simpler, more straightforward test consistent with the Supreme Court's decision in *Norfolk Southern Railway Co. v. Kirby* for making this determination.[2]

## I.     BACKGROUND

On October 12, 2005, Apache Corporation ("Apache") entered into a blanket master services contract ("MSC") with Specialty Rental Tools & Supply, L.L.P. ("STS"). The MSC included an indemnity provision running in favor of Apache and its contractors.[3] In early 2011, Apache issued an oral work order directing STS to perform "flow-back" services on a gas well in navigable waters in Louisiana in order to remove obstructions hampering the well's flow. A stationary production platform provided the only access to the gas well. The work order did not require a vessel, and neither Apache nor STS anticipated that a vessel would be necessary to perform the job.

---

\*    Judge Jolly, now a Senior Judge of this court, participated in the consideration of this en banc case.

\*\* Judge Davis, now a Senior Judge of this court, is participating as a member of the original panel.

\*\*\*Judges Willett and Ho were not on the court when this case was heard en banc.

[1] *See* 919 F.2d 313 (5th Cir. 1990).

[2] *See* 543 U.S. 14 (2004).

[3] A more exhaustive factual background can be found in the panel opinion. *See In re Larry Doiron, Inc.*, 869 F.3d 338, 340–41 (5th Cir. 2017).

No. 16-30217

On February 24, 2011, STS dispatched a two-man crew to perform the work required by the work order. After an unsuccessful day of work, the STS crew determined that some heavy equipment was needed to complete the job and that a crane would be required to lift the equipment into place. Because the production platform was too small to accommodate a crane, the crew suggested to Apache that it engage a barge equipped with a crane to lift the equipment. Apache agreed and contracted with Plaintiff Larry Doiron, Inc. ("LDI"), to provide a crane barge.

The next day, the LDI crew proceeded to the job site on the crane barge POGO and unloaded the equipment requested by the STS crew. After being unsuccessful, however, the STS crew discovered that it needed yet a different piece of equipment, so, with the aid of the crane, both crews began removing the heavy equipment previously unloaded. During this process, the LDI crane operator struck and injured one of the STS crewmembers, Peter Savoie, with the equipment.

Anticipating a claim from Mr. Savoie, LDI filed a limitation of liability proceeding as owner of the crane barge POGO. Savoie filed a claim in the limitation proceeding. LDI, as Apache's contractor, then filed a third-party complaint against STS, seeking indemnity under the terms of the MSC.

LDI filed a motion for summary judgment seeking a declaration that it was entitled to indemnity from STS under the MSC. STS filed a cross-motion for summary judgment seeking a determination that it owed no indemnity. The narrow issue presented was whether the MSC was a maritime contract. If so, general maritime law permitted enforcement of the indemnity provision. If not, Louisiana law controlled, and the Louisiana Oilfield Indemnity Act ("LOIA") precluded indemnity.[4] The district court concluded that maritime

---

[4] *See* LA. REV. STAT. § 9:2780(A).

3

law applied and awarded LDI indemnity from STS.  Our panel affirmed that judgment on appeal.  A majority of the active judges then voted to take the case en banc.

## II.    DISCUSSION

### A. Standard of Review

We review de novo a district court's grant of summary judgment.[5] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]  A genuine dispute exists if a reasonable jury could find in favor of the nonmoving party.[7]  All facts and evidence are viewed in the light most favorable to the nonmovant.[8]  We turn first to the existing law on maritime contracts in this circuit.

### B. Current Law

The issue in this case is whether the Court should apply maritime law or Louisiana law to determine the validity of the indemnity provisions in the MSC.  If Louisiana law applies, the indemnity agreement is void as against public policy.[9]  If, on the other hand, the contract is maritime and state law does not apply, then the indemnity obligation is enforceable.[10]

---

[5] *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 68 (5th Cir. 2014).

[6] FED. R. CIV. P. 56(a).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[8] *James*, 743 F.3d at 68.

[9] *See* LA. REV. STAT. § 9:2780(A).

[10] *See Hoda v. Rowan Cos.*, 419 F.3d 379, 380 (5th Cir. 2005).

LDI also argues that the choice-of-law clause in the MSC, which specifies general maritime law as the applicable law under which to construe the contract, should be enforced even if the contract is nonmaritime in nature.

Our case law makes clear that, if the contract is nonmaritime, Louisiana law will govern its construction even in the face of a choice-of-law clause.  This is so because enforcement of the choice-of-law clause would violate Louisiana's public policy and directly contravene LOIA.  *See Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 254 (5th Cir. 2001).

No. 16-30217

Our cases in this area have long been confusing and difficult to apply.  In *Thurmond v. Delta Well Surveyors*, Judge Garwood stated in his concurring opinion that he was "generally in agreement with Judge Wisdom's persuasive opinion, but . . . troubled by the tension, or perhaps outright inconsistency, between many of our opinions in this area."[11]  He elaborated that:

> [I]t seems to me that it may be desirable to consider this issue en banc, in order that we may take a more consistent approach to the question of whether and in what circumstances activities in connection with mineral development in state territorial waters are maritime (or perhaps "maritime and local[.]")][12]

Since 1990, we have followed the multi-factor test set forth in *Davis & Sons, Inc. v. Gulf Oil Corp.* ("*Davis & Sons*") to determine whether a contract is a maritime contract.[13]  Judge Rubin, in attempting to summarize and make sense of our case law, set forth numerous guiding principles:

> If . . . the contract consists of two parts, a blanket contract followed by later work orders, the two must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions.  The blanket contract is not of itself complete and calls for no specific work.  The actual contract between the parties therefore consists of the blanket agreement as modified by the later work order.[14]

He stated further:

> A contract may either contain both maritime and non-maritime obligations . . . .  If separable maritime obligations are imposed . . . , these are maritime obligations that can be separately enforced in admiralty without prejudice to the rest, hence subject to maritime law.[15]

> Whether the blanket agreement and work orders, read together, do or do not constitute a maritime contract depends, as does the

---

[11] 836 F.2d 952, 957 (5th Cir. 1988) (Garwood, J., concurring).

[12] *See id.* (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 738 (1961)).

[13] 919 F.2d at 316.

[14] *Id.* at 315.

[15] *Id.* at 315–16 (internal quotation marks, brackets, and citations omitted).

characterization of any other contract, on the nature and character of the contract, rather than on its place of execution or performance. A contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law. What constitutes maritime character is not determinable by rubric. The Supreme Court has resorted to the observation that a contract is maritime if it has a genuinely salty flavor.[16]

He concluded his synopsis by distilling these principles into the six-factor test at issue in this appeal:

Determination of the nature of a contract depends in part on historical treatment in the jurisprudence and in part on a fact-specific inquiry. We consider six factors in characterizing the contract: 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters? 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?[17]

A number of judges on this Court have since criticized this approach as confusing, particularly the six-factor, fact-intensive test.[18] In *Hoda v. Rowan Cos.*, Judge Jones began the opinion by stating that:

This appeal requires us to sort once more through the authorities distinguishing maritime and non-maritime contracts in the offshore exploration and production industry. As is typical, the final result turns on a minute parsing of the facts. Whether this is the soundest jurisprudential approach may be doubted, inasmuch as it creates uncertainty, spawns litigation, and hinders the rational calculation of costs and risks by companies

---

[16] *Id.* at 316 (internal quotation marks and citations omitted).

[17] *Id.*

[18] *See, e.g.*, *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1523 n.8 (5th Cir. 1996), (collecting cases expressing frustration with the inconsistent analysis of maritime contracts), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 788 (5th Cir. 2009) (en banc); *Hoda*, 419 F.3d at 380.

No. 16-30217

participating in this industry.  Nevertheless, we are bound by the approach this court has followed for more than two decades.[19]

Professor David W. Robertson has also pointed out some of the difficulties with the *Davis & Sons* test:

> The six factors are too pointillistic:  they have led Fifth Circuit panels down such odd lines of thought as "whether drilling mud services are more akin to wireline work [which has sometimes been viewed as quintessentially nonmaritime] or to casing services."[20]

For a variety of reasons, most of the prongs of the *Davis & Sons* test are unnecessary and unduly complicate the determination of whether a contract is maritime.  Judge Southwick's complex factual explication of the prongs in the panel opinion—which we consider below—demonstrates this point.[21]

The first *Davis & Sons'* prong asks:  What does the contract provide?[22] This is clearly an appropriate consideration in any contract case:  the language of the contract.  In this case, the contract consists of both the blanket MSC and the oral work order, which must be read together.[23]

The second prong asks:  What did the crew actually do?[24]  Analyzing this prong required the panel to parse the precise facts related to the services

---

[19] 419 F.3d at 380.

[20] David W. Robertson, *The Outer Continental Shelf Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law:  Correcting the Fifth Circuit's Mistakes*, 38 J. MAR. L. & COM. 487, 545 (2007).  For a more detailed criticism of the *Davis & Sons* test, see id. at 540–45.

[21] *See generally In re Doiron*, 869 F.3d.

[22] *Davis & Sons*, 919 F.2d at 316.

[23] STS argues that the following provision in the MSC contemplates the use of a vessel: "IF CONTRACTOR [STS] *USES* ANY VESSELS IN CONNECTION WITH ITS WORK FOR COMPANY OR COMPANY GROUP," additional vessel-related insurance is required. (emphasis added).

This insurance provision on its face has no application because STS did not provide or use a vessel—the vessel and crew were provided by LDI.  This provision requiring vessel-related insurance applied to contractors such as LDI.

[24] *Davis & Sons*, 919 F.2d at 316.

7

No. 16-30217

performed under the contract and determine whether those services were inherently maritime. Because none of our previous case law had considered the flow-back services at issue here and whether they were inherently maritime, the panel attempted to analogize flow-back services to other services considered in previous opinions.[25] This required the panel to give a detailed description of both this case and the analogous cases, comparing flow-back services to casing, wireline, and welding services.[26] In doing so, the panel added to the many pages dedicated to similar painstaking analyses in the Federal Reporter.[27] The fact is, none of these services are inherently maritime. As discussed below, the focus should be on whether the contract calls for substantial work to be performed from a vessel.

The third and fourth *Davis & Sons* prongs ask: Was the crew assigned to a vessel in navigable waters, and to what extent was the crew's work related to the mission of the vessel?[28] These facts would be relevant if we were required to decide whether the crew members were seamen but not relevant to whether the employer of the crewmembers entered into a maritime contract. The fifth prong asks: What was the principal work of the injured worker?[29]

---

[25] *See In re Doiron*, 869 F.3d at 343.

[26] *See id.* at 344–46.

[27] *Compare Thurmond*, 836 F.2d at 956 (finding wireline services nonmaritime in nature); *Domingue v. Ocean Drilling & Expl. Co.*, 923 F.2d 393, 398 (5th Cir. 1991) (same), *with Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332 (5th Cir. Unit A Aug. 1981) (finding casing services to be maritime in nature), *and Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1124–25 (5th Cir. 1992) (same); *see also* Kenneth G. Engerrand, *Primer of Remedies on the Outer Continental Shelf*, 4 LOY. MAR. L.J. 19, 61–63 (2005) (noting that historically, some service contracts are considered maritime in nature, including drilling and workover, casing, catering, repair, and well-site supervision, while other services contracts are traditionally nonmaritime in nature, including wireline work, testing and completion operations).

[28] *Davis & Sons*, 919 F.2d at 316.

[29] *See id.*

8

Again, this is not relevant to whether the injured worker's *employer* entered into a maritime contract.

The sixth prong asks:  What was the injured worker doing when injured?[30]  The facts surrounding the accident are relevant to whether the worker was injured in a maritime tort, but they are immaterial in determining whether the worker's employer entered into a maritime contract.

In our panel opinion, after exhaustively analyzing the facts of this case in light of the six-prong test, we limited our holding to the facts of this case and determined that the contract was maritime primarily because a vessel was essential to the completion of the job.[31]

### C. *Kirby*

Fortunately, the Supreme Court's opinion in *Norfolk Southern Railway Co. v. Kirby* lights a path to a simpler, more straightforward method for determining whether a contract is maritime and avoids most of the unnecessary analysis required by *Davis & Sons*.[32]  In *Kirby*, the Supreme Court considered a claim for money damages for cargo damaged in a train wreck.[33]  Under two coextensive bills of lading, the goods were transported from Australia to Huntsville, Alabama:  first by ship from Australia to Savannah, Georgia, and then by rail to Huntsville, Alabama.[34]  The question was whether the suit to recover for cargo damaged on the land leg of the trip fell within the Court's admiralty jurisdiction.[35]  The Court answered this in the affirmative because both bills of lading were maritime contracts.[36]  This was

---

[30] *Id.*

[31] *In re Doiron*, 869 F.3d at 345–47.

[32] *See* 543 U.S. at 22–27.

[33] *See id.* at 18.

[34] *See id.* at 18–21.

[35] *See id.* at 22–24.

[36] *See id.* at 24.

so, the Court reasoned, because the "primary objective" of these bills was "to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States."[37]

In considering whether the bills of lading were maritime contracts, the Court broadly defined what characterized a contract as maritime. The Court observed that:

> [W]e cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case. . . . Nor can we simply look to the place of the contract's formation or performance. Instead, the answer "depends upon . . . the nature and character of the contract," and the true criterion is whether it has "reference to maritime service or maritime transactions."[38]

The Court also emphasized that "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce."[39] "The conceptual approach," the Court explained, "vindicates that interest by focusing our inquiry on whether the principal objective of a contract is maritime commerce."[40] The *Kirby* opinion clarified that we should use contract rather than tort principles in determining whether a contract being sued upon is maritime.[41]

---

[37] *Id.*

[38] *Id.* (second alteration in original) (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)); *see also Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 611 (1991) ("[T]he trend in modern admiralty case law . . . is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime.").

[39] *Kirby*, 543 U.S. at 25 (emphasis removed) (internal quotation marks and citations omitted).

[40] *Id.*

[41] *Id.* at 24. The Court explained that "[g]eography . . . is useful in a conceptual inquiry only in a limited sense: If a bill's *sea* components are insubstantial, then the bill is not a maritime contract." *Id.* at 27.

No. 16-30217

The Court in *Kirby* rejected the mixed-contract theory applied in some circuits and which was one of the underpinnings of the *Davis & Sons* panel's rationale in formulating its six-prong test. *Davis & Sons* explained that:

> A contract may either contain both maritime and non-maritime obligations or, as in the Gulf-Davis blanket agreement, contemplate future detailed contracts having different characteristics. If separable maritime obligations are imposed by the supplementary contracts, or work orders, these are "maritime obligations [that] can be separately enforced [in admiralty] without prejudice to the rest," hence subject to maritime law.[42]

The *Kirby* court, after disapproving mixed-contract decisions from the Second, Fifth, and Federal Circuit Courts of Appeal,[43] added the following:

> Furthermore, to the extent that these lower court decisions fashion a rule for identifying maritime contracts that depends solely on geography, they are inconsistent with the conceptual approach our precedent requires. Conceptually, so long as a bill of lading requires *substantial* carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage.[44]

Our cases have long held that the drilling and production of oil and gas on navigable waters from a vessel is commercial maritime activity. For example, in *Theriot v. Bay Drilling Corp.*, we considered a contract for supplying a submersible drilling barge and concluded that the contract was clearly maritime, noting that "[o]il and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce."[45] We recently affirmed this understanding of commercial maritime activity in *In re Deepwater Horizon*,

---

[42] *See Davis & Sons*, 919 F.2d at 315–16 (footnote omitted).

[43] *See, e.g.*, *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 290 (5th Cir. 1989).

[44] *Kirby*, 543 U.S. at 27 (emphasis added) (internal citation omitted).

[45] 783 F.2d 527, 538–39 (5th Cir. 1986).

11

No. 16-30217

where we concluded that maritime law applied in reference to the oil spill that "occurred while the vessel[, Deepwater Horizon,] was engaged in the maritime activity of conducting offshore drilling operations."[46]

## III.  CONCLUSION

Based on the principles laid out in *Kirby*, we adopt the following two-pronged test to determine whether a contract in this context is maritime:  First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters?  The answer to this inquiry will avoid the unnecessary question from *Davis & Sons* as to whether the particular service is inherently maritime.  Second, if the answer to the above question is "yes," does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?[47]  If so, the contract is

---

[46] 745 F.3d 157, 166 (5th Cir. 2014); *see also Boudreaux v. Am. Workover, Inc.*, 664 F.2d 463, 466 (5th Cir. Unit A Dec. 1981) (noting that vessel-related oil and gas drilling and production "is a major industry with peculiar maritime-related problems," and, further, that because it is "an industry that provides approximately 40,000 jobs, and untold millions of dollars in revenues and that takes place primarily upon the navigable waters of the United States," it "bears 'a significant relationship to . . . commerce on navigable waters'") (alteration in original) (footnote and internal citation omitted); *Pippen v. Shell Oil Co.*, 661 F.2d 378, 384 (5th Cir. Unit A Nov. 1981) ("[O]ffshore drilling the discovery, recovery, and sale of oil and natural gas from the sea bottom is maritime commerce . . . ."); *Corbitt*, 654 F.2d at 332 (finding that a contract requiring the furnishing of a casing crew to a submersible drilling barge was a maritime contract); *Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge*, 424 F.2d 684, 688–91 (5th Cir. 1970) (finding that a drilling and re-work contract requiring the operation and "survey" of a submersible drilling barge was maritime in nature).

[47] When work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract.  In *Chandris, Inc. v. Latsis*, in formulating the test for whether a worker's connection to a vessel was substantial enough to qualify him as a seaman under the Jones Act, 46 U.S.C. § 30104, the Supreme Court noted:

> [S]ubstantiality in this context is determined by reference to the period covered by the Jones Act plaintiff's maritime employment, rather than by some absolute measure.  Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case:  A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act.  This figure of course serves as

maritime in nature.[48] We find strong support in *Kirby* for this test, particularly in the following sentence:  "Conceptually, so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract."[49]  Also, in *Kirby*, the parties obviously expected a vessel to play a major role in transporting the cargo from Australia to Alabama.[50]

This test places the focus on the contract and the expectations of the parties.  This is the proper approach in a contract case and assists the parties in evaluating their risks, particularly their liability under indemnification clauses in the contract.[51]  This test also removes from the calculus those prongs of the *Davis & Sons* test that are irrelevant, such as whether the service work

---

no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.

515 U.S. 347, 371 (1995).  The district courts may develop a similar rule of thumb in evaluating substantiality in this context.  However, we leave this for further development below.  The calculus would not include transportation to and from the job site.

[48] *See* Robertson, *supra* note 20, at 547–48.

[49] *See Kirby*, 543 U.S. at 27.  Six other circuits have applied *Kirby* to determine whether a contract is a maritime one in various circumstances; though none of those decisions addressed a factual situation similar to that in this case, the approaches in those decision are not inconsistent with this test.  *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 822 F.3d 620, 631–36 (2d Cir. 2016) (analyzing whether an insurance contract was maritime); *N.H. Ins. Co. v. Home Sav. & Loan Co.*, 581 F.3d 420, 424–27 (6th Cir. 2009) (same); *Sentry Select Ins. Co. v. Royal Ins. Co.*, 481 F.3d 1208, 1218–20 (9th Cir. 2007) (same); *Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352, 361–63 (4th Cir. 2014) (analyzing whether forward freight agreements were maritime contracts); *Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 636 F.3d 1338, 1340–41 (11th Cir. 2011) (analyzing whether a contract to conduct research pertaining to a shipwrecked vessel was maritime); *Puerto Rico Ports Auth. v. Umpierre-Solares*, 456 F.3d 220, 224–26 (1st Cir. 2006) (analyzing whether a contract to remove a sunken ship from navigable waters was maritime); *see also* ROBERT FORCE & MARTIN J. NORRIS, THE LAW OF MARITIME PERSONAL INJURIES § 1:22 (5th ed. 2017) (discussing *Kirby*'s approach to analyzing maritime contracts).

[50] *See Kirby*, 543 U.S. at 19.

[51] We applied a similar analysis in *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, where we held that the focus of the contract, rather than the situs of the injury, was the relevant consideration for the purposes of evaluating the applicability of an indemnity agreement.  *See* 589 F.3d at 786–89; *see also* FORCE & NORRIS, *supra* note 49, § 13:9 (discussing cases applying the rule emanating from *Grand Isle Shipyard*).

itself is inherently maritime and whether the injury occurred following a maritime tort. Courts need not determine whether this service work has a more or less salty flavor than other service work when neither type is inherently salty.

This does not mean, however, that some of the *Davis & Sons* factors are never relevant. The scope of the contract may be unclear; the extent to which the parties expect vessels to be involved in the work may also be unclear. In resolving these issues, courts may permit the parties to produce evidence of the work actually performed and the extent of vessel involvement in the job. It is also conceivable, for example, that the seamen status of a crew—which is implicated in two of the *Davis & Sons* factors—could be relevant to whether the vessel involvement was a substantial part of the overall contract. If the contract provided only for work to be done by permanent crewmembers aboard a vessel, the substantial vessel involvement issue would ordinarily be answered. If part of the contract work involves work by crewmembers aboard a vessel and part does not, the work by seamen aboard a vessel would be part of the factual mix that the district court could consider in resolving whether the overall contract involved substantial involvement of a vessel.[52]

Applying this new test to this case, the oral work order called for STS to perform downhole work on a gas well that had access only from a platform. After the STS crew began work down hole, the crew encountered an unexpected problem that required a vessel and a crane to lift equipment needed to resolve this problem. The use of the vessel to lift the equipment was an insubstantial part of the job and not work the parties expected to be performed. Therefore,

---

[52] We deal today only with determining the maritime or nonmaritime nature of contracts involving the exploration, drilling, and production of oil and gas. If an activity in a non-oil and gas sector involves maritime commerce and work from a vessel, we would expect that this test would be helpful in determining whether a contract is maritime.

No. 16-30217

the contract is nonmaritime and controlled by Louisiana law.  The LOIA bars indemnity.  Accordingly, we reverse the summary judgment in favor of LDI and grant summary judgment in favor of STS, render judgment in favor of STS, and dismiss LDI's third-party complaint against STS.

REVERSED AND RENDERED.