# United States Court of Appeals
# for the Fifth Circuit

————————

No. 22-30582

————————

United States Court of Appeals
Fifth Circuit

**FILED**

January 11, 2024

Lyle W. Cayce
Clerk

JEREMY EARNEST

*Plaintiff*,

*versus*

PALFINGER MARINE U S A, INCORPORATED,

*Defendant—Appellant*,

*versus*

SHELL OIL COMPANY,

*Defendant—Appellee*,

————————————————

PATTY DUPRE, *Individually and on behalf of minor child*, D D; GAGE DUPRE,

*Plaintiffs*,

*versus*

PALFINGER MARINE U S A, INCORPORATED,

*Defendant/Cross-Claimant/Third Party Plaintiff—Appellant*,

*versus*

SHELL OIL COMPANY

*Defendant/Cross-Defendant—Appellee*,

SHELL OFFSHORE, INCORPORATED; SHELL EXPLORATION & PRODUCTION COMPANY,

*Third Party Defendants—Appellees*,

_____

DEVIN MARCEL, *Individually & on behalf of* GARY MARCEL ESTATE,

*Plaintiff*,

*versus*

PALFINGER MARINE U S A, INCORPORATED,

*Defendant/Cross-Claimant/Third Party Plaintiff—Appellant*,

*versus*

SHELL OFFSHORE, INCORPORATED,

*Defendant/Cross-Defendant—Appellee*,

SHELL EXPLORATION & PRODUCTION COMPANY; SHELL OIL COMPANY,

*Third Party Defendants—Appellees*,

_____

DANIEL J. LEBEOUF, JR.

*Plaintiff*,

*versus*

PALFINGER MARINE U S A, INCORPORATED,

2

*Defendant—Appellant*,

*versus*

Shell Oil Company,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC Nos. 6:20-CV-685, 6:20-CV-756,
6:20-CV-773, 6:20-CV-813

_____

Before Southwick, Engelhardt, and Wilson, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

Is a contract to inspect and repair lifeboats on an oil platform located on the Outer Continental Shelf a maritime contract? The answer matters because it affects whether indemnity might be owed by one corporate defendant to the other for payments to third parties. The district court held the contract was not a maritime one. We conclude it is. Further proceedings are necessary to determine whether indemnity must be paid. REVERSED and REMANDED.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a tragic June 2019 accident when a lifeboat detached from an oil platform, killing two workers and injuring another. The accident occurred on the Auger Tension Leg Platform, which is owned and operated by Shell Offshore, Inc., Shell Exploration & Production Company, and Shell Oil Company (collectively, "Shell"). It is located about 130 miles off the Louisiana coast. The parties agree that the Auger is not itself a vessel. Palfinger Marine, USA, Inc. states that the Auger is "a floating [Outer

3

No. 22-30582

Continental Shelf] facility" under the United States Coast Guard's classifications, and it is not a vessel "because its legs are attached, even if only temporarily, to the seafloor." This description may place the Auger in the category of "spars," which are not vessels because they are anchored to the seabed and are not intended to be moved. *See Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 355, 358 (5th Cir. 1999).

The platform contains ten lifeboats, as required by the Coast Guard, sufficient to evacuate all oil rig workers in case of an emergency. 46 C.F.R. § 108.525. Shell is required to maintain those lifeboats "in good working order and ready for immediate use at all times" and to conduct quarterly drills where "[e]ach lifeboat must be launched with its assigned operating crew aboard." 46 C.F.R. §§ 109.213(d)(3), 109.301(a).

In 2018, Shell and Palfinger entered a Purchase Contract for goods and services pertaining to Shell's lifeboats on the Auger Platform.[1] The Purchase Contract is akin to a master service contract. Under the contract, Palfinger agreed to provide annual inspections, maintenance, repairs of the lifeboats, and "5 year reoccurring cable change outs" of the davit systems used to launch the lifeboats from the platform. The contract also contains indemnity provisions, whereby Shell agreed to indemnify Palfinger for liabilities resulting from "death, injury, or disease" of any Shell employee. The provisions exclude any "liabilities that did not arise in connection with the contract" and "liabilities caused by [Palfinger's] gross negligence . . . or wil[l]ful misconduct."

---

[1] The lifeboats are substantial crafts called TEMPSCs — "totally enclosed motor propelled survival craft." They are approximately 24 feet long, have a full-load capacity of 13,306 pounds, and can carry 33 persons.

4

No. 22-30582

In June 2019, Palfinger performed inspections on several lifeboats, including Lifeboat 6, as well as five-year cable change-outs on Lifeboats 1 and 3. As provided in the Purchase Contract, a purchase order was executed for these services. The work was performed from the oil platform and inside the lifeboats, which were attached to the platform by cables. It was during this inspection that Palfinger noticed a corroded release cable on Lifeboat 6 and recommended the cable be replaced.[2] Palfinger nonetheless reported that "[a]ll systems [were] found to be [in] correct working order" and instructed Shell to place the "[life]boats back to service and made ready for use."

A few weeks later, Shell conducted a quarterly drill of several lifeboats, including Lifeboat 6. The lifeboats were successfully launched from the platform. During the recovery of Lifeboat 6, the corroded cable failed, causing the lifeboat to fall 80 feet into the water. The two oil rig workers still on the lifeboat were killed. A third worker was injured.

The injured worker and families of the deceased workers filed suit against Palfinger and Shell. Palfinger asserted third-party indemnity claims against Shell under the Purchase Contract. The individuals' claims were settled and are not at issue in this appeal. In the settlement agreement, Palfinger and Shell preserved Palfinger's indemnity defense for appeal.

In district court, Shell and Palfinger filed cross-motions for partial summary judgment addressing the indemnity provisions in the Purchase Contract. The central disagreement was whether the Purchase Contract is a maritime contract. If the Purchase Contract is a maritime contract, then the indemnity provisions would be valid under maritime law. On the other hand, if the Purchase Contract is not maritime, Louisiana law would apply, making

_____

[2] The parties dispute whether Palfinger informed Shell that the cable needed to be replaced. That dispute is not material to this appeal.

the indemnity provisions unenforceable. The settlement agreement does not appear to concede that indemnity would be owed if the Purchase Contract is maritime. Our sole issue is the category in which to place the contract.

Applying this circuit's test from *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018) (*en banc*), the district court held the Purchase Contract was not a maritime contract. The court granted Shell's motion for partial summary judgment and denied Palfinger's. This appeal timely followed.

## DISCUSSION

The Plaintiffs' claims arose under the Outer Continental Shelf Lands Act ("OCSLA"), giving the district court federal-question jurisdiction under 28 U.S.C. § 1331. *See Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 221 (5th Cir. 2013). We have appellate jurisdiction under 28 U.S.C. § 1291.

"We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court." *Huskey v. Jones*, 45 F.4th 827, 830 (5th Cir. 2022) (citation omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law FED. R. CIV. P. 56(a). The genuine dispute here is legal, not factual.

*I.     Choice of law*

The sole issue on appeal is whether Shell's and Palfinger's Purchase Contract was a maritime contract, which in this case dictates whether federal or state law applies under the OCSLA's choice of law provision. 43 U.S.C. § 1333(a). In analyzing the issue, the district court relied on the *Rodrigue/PLT* test. *See Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355–56 (1969); *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990). Those authorities set out three requirements for state law to apply. "(1) The controversy must arise on a situs covered by OCSLA (i.e.

the subsoil, seabed, or artific[i]al structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." *PLT Eng'g,* 895 F.2d at 1047; *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 783 (5th Cir. 2009) (*en banc*).

The district court determined that all three requirements of the *Rodrigue/PLT* test were satisfied. In deciding the second requirement, whether federal maritime law applies of its own force, the district court relied on *Doiron*'s two-factor test for determining whether a contract relating to offshore oil and gas exploration and production is maritime. It reasoned that although "the Shell-Palfinger purchase and maintenance contract involved 'services to facilitate the drilling or production of oil and gas on navigable waters,' the record [did] not reflect that a vessel [would] play a substantial role in the completion of the contract." The contract therefore was not maritime and federal maritime law did not apply of its own force.

The district court then held that Louisiana law applies. That rendered the Purchase Contract's indemnity provision unenforceable under the Louisiana Anti-Indemnification Act, which precludes indemnity agreements pertaining to oil, gas, and certain mineral wells. La. R.S. 9:2780(B), (C).

On appeal, Palfinger does not challenge the district court's decision regarding the first and third requirements of the *Rodrigue/PLT* test nor the consequences that would follow if Louisiana law applied. Instead, Palfinger challenges only the second requirement, whether federal maritime law would apply of its own force. What would cause it to apply of its own force is if the Purchase Contract is a maritime contract. *Barrios v. Centaur, LLC*, 942 F.3d 670, 675–76 (5th Cir. 2019).

No. 22-30582

## II.    Maritime contracts

To begin our review, we consider how *Doiron* fits within the wider context of maritime law.  We will then show how *Doiron* applies in this case.

### a.    *Maritime law and the* Doiron *test*

*Doiron* concerned a work order under a master service contract to perform "flow-back" services to remove obstructions hampering a gas well in the navigable waters of Louisiana.  *Doiron*, 879 F.3d at 569–70.  The contract did not require or contemplate the use of a vessel, but a barge equipped with a crane was later determined to be necessary to lift heavy equipment used to complete the work.  *Id.* at 570.  A worker injured by the crane sued the crane's owner, and the issue on appeal concerned the master service contract's indemnity provision.  *Id.*

The *en banc* court acknowledged that Fifth Circuit caselaw distinguishing between maritime and nonmaritime contracts in the offshore oil field context has "been confusing and difficult to apply."  *Id.* at 571.  Beginning in 1990, we had applied the six-factor test established in *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5th Cir. 1990).[3]  This multi-factor, fact-intensive test often "unduly complicate[d] the determination of whether a contract is maritime."  *Doiron*, 879 F.3d at 572.  In *Doiron*, we sought to "simplify the is-this-contract-maritime inquiry" and "streamline" the six-factor test.  *Barrios*, 942 F.3d at 678–79.  We also endeavored to align our test with the Supreme Court's decision in *Norfolk Southern Railway Co.*

---

[3] The test was this:  "1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?"  *Davis & Sons*, 919 F.2d at 316.

*v. Kirby*, 543 U.S. 14 (2004), which rejected the mixed-contract theory underlying the rationale of *Davis & Son*'s six-factor test. *Doiron*, 879 F.3d at 574–76. In doing so, we recognized *Kirby*'s emphasis that "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." *Id.* at 574 (quoting *Kirby*, 543 U.S. at 25).

Based on *Kirby*'s principles, we adopted a two-factor test for determining whether a contract is maritime in the context of offshore drilling:

> First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters? . . . Second, if the answer to the above question is "yes," does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?

*Id.* at 576.[4] This test "removes from the calculus those prongs of the *Davis & Sons* test that are irrelevant, such as whether the service work itself is inherently maritime" and instead "places the focus on the contract and the expectations of the parties." *Id.* at 576–77. We cautioned that some of the *Davis & Sons* considerations could still be relevant to the extent the scope of the contract and the parties' expectations are unclear. *Id.* at 577.

Applying this test, the *Doiron en banc* court held that the first factor was satisfied because the work order to remove obstructions from a gas well provided services to facilitate "the drilling or production of oil and gas on navigable waters from a vessel," which precedent treated as "commercial maritime activity." *Id.* at 575–76. Applying the second factor of whether a vessel would have a substantial role, we held the work order was nonmaritime because it did not provide for and the parties did not anticipate that a vessel

---

[4] We have since expanded the test to include non-oil-and-gas-related activities, but such an expansion is irrelevant to this case. *Barrios*, 942 F.3d at 678–80.

would be used to complete the work. *Id.* at 577. The crane barge was used only after "the crew encountered an unexpected problem," and "[t]he use of the [barge] to lift the equipment was an insubstantial part of the job." *Id.*

We now examine the admiralty law background to *Doiron* that allows us to understand some of its nuances.

### b.     *The maritime voyage to* Doiron

We start with the bedrock principle that whether a contract is maritime depends on "the nature and character of the contract," which focuses on whether it references "maritime service[s] or maritime transactions." *North Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919); *Kirby*, 543 U.S. at 23–24. This requires a "conceptual rather than spatial approach," under which we do not consider where formation or performance of the contract took place but instead evaluate the substance of the contract. *Kirby*, 543 U.S. at 23–24; *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961). "Admiralty is not concerned with the form of the action, but with its substance." *Krauss Bros. Lumber Co. v. Dimon S.S. Corp.*, 290 U.S. 117, 124 (1933). The boundaries of this approach "have always been difficult to draw," and "[p]recedent and usage are helpful insofar as they exclude or include certain common types of contract." *Kossick*, 365 U.S. at 735.

A well-recognized treatise provides a useful summary of classical maritime contracts. *See* 1 BENEDICT ON ADMIRALTY § 182 (Joshua S. Force & Steven F. Friedell eds., 2023). "In general, a contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction, whether the contract is to be performed on land or water." *Id.* Nonetheless, mere reference to ships or vessels is not enough. *Id.* Instead, "there must be a direct and substantial

link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry." *Id.* Thus, "a contract to repair or to insure a ship is maritime, but a contract to build a ship is not." *Kossick*, 365 U.S. at 735 (citations omitted); *see also North Pac. S.S. Co.*, 249 U.S. at 127 (distinguishing repair and construction). "It is well settled that a contract to repair a vessel is maritime." *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5th Cir. 1967).

Next, we must account for the OCSLA, which was enacted in 1953. Pub. L. No. 83-212, 67 Stat. 462 (1953). The Act extends federal law to "all artificial islands" and "installations and other devices . . . attached to the seabed," as well as other artificial structures in the Outer Continental Shelf. 43 U.S.C. § 1333(a)(1)(A). Congress chose not to treat oil and gas offshore platforms as vessels, but instead "as island[s] or as federal enclaves within a landlocked State." *Rodrigue*, 395 U.S. at 361. The Act incorporates adjacent state law as federal law on these fictional enclaves, but only to the extent they are "not inconsistent with . . . other Federal laws." § 1333(a)(2)(A). We have held that the OCSLA "does not oust admiralty law having a basis of applicability independent from the location of the platforms at sea." *Kimble v. Noble Drilling Corp.*, 416 F.2d 847, 850 (5th Cir. 1969). Since *Rodrigue* and *Kimble*, we determine when admiralty or maritime law would apply of its own force, independent of the location of a controversy on an offshore platform.[5]

To make this determination in contract cases, "the principle underlying *Rodrigue* and *Kimble* precludes the application of maritime law

---

[5] Before *Rodrigue*, we held that federal maritime law applied to incidents occurring from the production of resources on the Outer Continental Shelf because such "hazards . . . were essentially maritime in nature." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1230 (5th Cir. 1985) (citing *Pure Oil Co. v. Snipes*, 293 F.2d 60, 67–69 (5th Cir. 1961)). But *Rodrigue* rejected this construction of the OCSLA. *Id.*

except in those cases where the subject matter of the controversy bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985). The panel in *Laredo* then cited to *Kossick* and *Benedict on Admiralty* for their discussion of traditional maritime activities that would invoke admiralty jurisdiction. *Id.* Those activities are the same as the ones discussed above, *i.e.*, contracts "relating to a ship in its use as such" and "to repair or to insure a ship," among others. 1 BENEDICT ON ADMIRALTY § 182; *Kossick*, 365 U.S. at 735 (citations omitted).

Our approach to determining whether contracts involved traditional maritime activities was inconsistent and led to divergent results. *See Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 957 (5th Cir. 1988) (Garwood, J., concurring). Inconsistencies multiplied because a "[d]etermination of the nature of a contract depends in part on historical treatment in the jurisprudence." *Davis & Sons*, 919 F.2d at 316; *see Kossick*, 365 U.S. at 735. In attempting to reconcile these divergent results, whether a vessel had a substantial role in the work became a key factor. Seemingly comparable cases reached different results based on whether the role of a vessel was "inextricably intertwined with [the] maritime activities" of an offshore rig rather than "merely incidental" to them. *Compare Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1123 (5th Cir. 1992), *with Domingue v. Ocean Drilling & Expl. Co.*, 923 F.2d 393, 397 & n.7 (5th Cir. 1991); *see also Hoda v. Rowan Cos.*, 419 F.3d 379, 381–83 (5th Cir. 2005).

Nearly 30 years of applying the *Davis & Sons* factors and reconciling our precedents led us astray from where our focus should have been.[6] The

---

[6] For example, the *Doiron* three-judge panel found that the use of the crane barge was "inextricably intertwined" with the operations of the gas well because it was "necessary" to execute the service contract. *In re Doiron*, 869 F.3d 338, 344–45 (5th Cir.

central goal of whatever test is used has always been to determine whether the contract "bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction." *Laredo*, 754 F.2d at 1231. Our *en banc Doiron* decision, with the assistance of *Kirby*'s rejection of mixed-contract theory, provided a much-needed correction by focusing us on where *North Pacific* instructed over 100 years ago: "the nature and character of the contract" and its "reference to maritime service or maritime transactions." *Doiron*, 879 F.3d at 574 (quoting *Kirby*, 543 U.S. at 24 (quoting *North Pac. S.S. Co.*, 249 U.S. at 125)). In none of our cases were the traditional maritime activities described in *Kossick* and *Benedict on Admiralty* discarded as irrelevant. *Laredo*, 754 F.2d at 1231.

In summary, the *Doiron* test determines whether maritime law applies of its own force through a contract bearing the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction. The focus of this analysis is on the contract and the parties' expectations, and the role of the vessel should be viewed in light of what is considered classically maritime.

## III.    *Application to the present case*

Palfinger's Purchase Contract with Shell provided "services to facilitate the drilling or production of oil and gas on navigable waters." *Doiron*, 879 F.3d at 576. The contract required annual inspections and repairs on the Auger Platform's lifeboats and five-year cable changeouts of the davit systems tying the lifeboats to the rig, as well as other related tasks. These lifeboats, their inspection and testing, and the use of davits and

---

2017), *rev'd en banc*, 879 F.3d 568 (5th Cir. 2018). But as the *en banc* court explained, the contract did not call for and the parties did not expect that a vessel would be used. *Doiron*, 879 F.3d at 577.

winches are all required by Coast Guard regulations for Shell to conduct its exploration and production operations. 46 C.F.R. §§ 108.500–108.597, 109.213, 109.301. That such operations could not occur without Palfinger's services sufficiently establishes that the services facilitate the drilling or production of oil and gas. Similarly, we have held that services to decommission a well as required to obtain a drilling permit facilitated the drilling and production of oil and gas. *Crescent Energy Servs., LLC v. Carrizo Oil & Gas, Inc.*, 896 F.3d 350, 356–57 (5th Cir. 2018).

When the district court found that the Purchase Contract did not provide for and the parties did not expect that vessels would play a substantial role in performance, the court was considering only the *use* of a vessel. The *Doiron* test itself, though, does not refer to whether a vessel will be *used*. It focuses on whether the contract provides or the parties expect "a vessel will play a *substantial role* in the completion of the contract." *Doiron*, 879 F.3d at 576 (emphasis added). The *Doiron* test allows a finding that a contract is maritime when a vessel is not the object of the contract. It does not require the opposite finding when the maintenance and repair of vessels are the purposes of the contract, as such are traditional maritime activities. *See Kossick*, 365 U.S. at 735; 1 Benedict on Admiralty § 182.

The remaining issue is whether lifeboats are vessels. The Palfinger-Shell Purchase Contract pertains solely to the lifeboats and the systems connecting them physically and operationally to the Auger Platform. The subject matter of the contract is the lifeboats and their operational readiness. Lifeboats are vessels in that they are "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. "[A] reasonable observer, looking to the [floating structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Lozman v. City of Riviera Beach*, 568 U.S. 115, 121 (2013). It is therefore

irrelevant that lifeboats can also be described as safety equipment, as all that would mean is that they are vessels that serve a safety purpose.

We conclude that the Purchase Contract is a classically maritime contract. *See Alcoa S.S. Co.*, 383 F.2d at 50. The district court decided otherwise. First, the court relied on where the work was conducted, *i.e.*, on the Auger Platform or on the lifeboats themselves. That is the type of spatial analysis that is inapplicable to maritime contracts, which requires a conceptual analysis. *Kirby*, 543 U.S. at 23–24. Instead, the "nature and character" of the contract is for the repair and maintenance of vessels necessary to support offshore drilling and production of oil and gas, *i.e.*, maritime commerce. *Doiron*, 879 F.3d at 575.

Second, the district court dismissed the involvement of lifeboats as vessels because it concluded that, like *Doiron*, the vessels were only incidental to the performance of the contract. Third, the district court reasoned that because Palfinger did not "use" the lifeboats to complete a substantial portion of the work, the Purchase Contract was not maritime. We discuss these two reasons together, because our response is the same to both.

The court's focus on "use," and not on whether a vessel will play a substantial role in the completion of the contract, made the lifeboats incidental when instead they are central to performance of this contract. The inspection, repair, and maintenance of the lifeboats are the reason for the purchase order under the Purchase Contract. It is certainly true that, in applying the actual factor of whether a vessel had a substantial role, *Doiron* discussed whether a vessel was "use[d]" to perform the work or whether the work was performed "from" a vessel. *Id.* at 573, 577. That discussion was appropriate based on the facts in *Doiron*. The overarching consideration, though, is whether it was contemplated "that a vessel would be necessary to

perform the job." *Id.* at 570. A contract for maintenance and repair of a vessel inevitably gives the vessel a substantial role. *Id.* at 576.

*Doiron*'s requirement that "a vessel will play a substantial role" in completing the contract, *id.*, incorporates the traditional view that "a contract relating to a ship in its use as such" is a maritime contract if "there [is] a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat," 1 BENEDICT ON ADMIRALTY § 182. In other words, *Doiron*'s test contemplates traditional maritime activities because it ensures that the relation of the contract to the vessel, *i.e.*, the vessel's role, is substantial rather than incidental.

Finally, the district court held, and Shell argues, that the lifeboats themselves were not engaged in maritime commerce. *Kirby* instructs that the conceptual, as opposed to spatial, approach protects maritime commerce by "focusing our inquiry on whether the principal objective of a contract is maritime commerce." *Kirby*, 543 U.S. at 25. Regardless of whether employing a lifeboat as a lifeboat means its passengers are engaged in maritime activity, the lifeboats are a required component of "drilling and production of oil and gas on navigable waters from a vessel[, which] is commercial maritime activity." *Doiron*, 879 F.3d at 575. This factor asks "is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters?" *Id.* at 576. In the oil and gas context, the first factor considers whether the contract's purpose is to effectuate maritime commerce and the second ensures that the use of a vessel to do so is substantial instead of merely incidental. *Id.*; *Barrios*, 942 F.3d at 680.

In none of our cases have we required that the vessel itself be engaged in maritime commerce. *See, e.g.*, *Crescent*, 896 F.3d at 361; *Hoda*, 419 F.3d at 383. Indeed, *Doiron* itself assumed the crane barge satisfied the first factor because its application was not even discussed. *Doiron*, 879 F.3d at 576–77.

The offshore oil and gas drilling is what satisfied the first factor. *Id.* at 575, 577. Therefore, the *en banc* court reasonably found no need even to discuss the first factor — even though the second factor is relevant only after the answer to the first is "yes." *Id.* at 576.

We REVERSE the district court's decision and REMAND for additional proceedings consistent with this opinion.