# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 15, 2025

Lyle W. Cayce
Clerk

————————

No. 24-20357

————————

Genesis Energy, L.P.; Genesis Energy, L.L.C.,

*Defendants—Appellants*,

*versus*

Danos, L.L.C.,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-3090

_____

Before Elrod, *Chief Judge*, and Duncan and Engelhardt, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

Genesis Energy appeals the dismissal of its crossclaim for defense and indemnification against Danos, LLC, in the underlying personal injury lawsuit. After both parties filed cross motions for summary judgment, the district court concluded that the parties' contract was not a "maritime contract" and therefore that the contract's indemnity provision was invalid. It accordingly denied Genesis's motion and granted Danos's motion. Because we agree that the parties' contract is not a maritime contract, we AFFIRM.

No. 24-20357

I

In 2020, Hurricane Laura damaged an offshore platform called Genesis Garden Banks 72 ("Platform"). Appellant Genesis Energy, LP, owns the Platform, which is located on the outer Continental Shelf off the coast of Louisiana. Genesis Energy, LLC, a wholly owned subsidiary of the limited partnership, contracted with Appellee Danos, LLC, to conduct repairs to the Platform. To facilitate the project, the Genesis parties (collectively, "Genesis"[1]) also chartered the 240-foot Cheramie Botruc #41 ("Vessel"), which was owned by a third-party company, L&M Botruc Rental, LLC ("Botruc Rental").

In November 2020, a Danos employee, Maximo Sequera, suffered injuries during Platform repairs when he fell from a personnel basket carrying him from the Platform to the Vessel. He sued Danos, Genesis, and Botruc Rental in Texas state court to recover for his injuries, and Danos removed the action to federal court.

Genesis later filed a crossclaim against Danos seeking defense and indemnification. According to Genesis, a 2008 Master Services Agreement executed by the parties' predecessors in interest required indemnification. Genesis therefore filed a motion for summary judgment asserting that Danos was contractually obligated to indemnify it, and Danos filed a cross-motion seeking dismissal of Genesis's claim.

The district court concluded that the parties' contract was not a "maritime contract," meaning that Louisiana law applied under the Outer Continental Shelf Lands Act ("OCSLA") and barred the enforceability of the indemnification provision. Accordingly, the court granted Danos's

---

[1] The parties' briefing refers to "Genesis" without differentiating between the two entities. We therefore do the same.

cross-motion, denied Genesis's motion, and dismissed Genesis's crossclaim with prejudice. The court then granted Danos's and Genesis's joint motion to designate that order as a final judgment under Federal Rule of Civil Procedure 54(b) and entered final judgment.

This appeal followed. Both parties agree that jurisdiction is proper under 28 U.S.C. § 1291.

## II

A grant of summary judgment is reviewed *de novo*. *Molina v. Home Depot USA, Inc.*, 20 F.4th 166, 168 (5th Cir. 2021). "Summary judgment should be granted, viewing the evidence in the light most favorable to the nonmoving party, if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 168–69 (citing Fed. R. Civ. P. 56(a)). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023).

## III

In 1953, Congress enacted OCSLA "to define a body of law applicable to the seabed, the subsoil, and the fixed structures such as" artificial drilling platforms, like the Platform, located on the outer Continental Shelf. *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969); *see also* OCSLA, Pub. L. No. 83-212, 67 Stat. 462 (1953). OCSLA generally treats offshore oil and gas platforms as "island[s] or as federal enclaves within a landlocked State." *Earnest v. Palfinger Marine USA, Inc.*, 90 F.4th 804, 810 (5th Cir. 2024) (alteration in original) (citation omitted). So, for contracts pertaining to those platforms, OCSLA adopts the law of the state adjacent to the relevant part of the outer Continental Shelf as surrogate federal law. 43 U.S.C. §

1333(a)(2)(a); *Willis v. Barry Graham Oil Serv., L.L.C.*, 122 F.4th 149, 156 (5th Cir. 2024).  Here, the adjacent state is Louisiana.

Federal maritime law, however, applies if a contract is a maritime contract, among other requirements not at issue here.  *See Willis*, 122 F.4th at 156.  In *In re Larry Doiron, Inc.*, we adopted a two-prong test to determine whether a contract is maritime.  879 F.3d 568, 576 (5th Cir. 2018) (en banc).  That test asks:  (1) "is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters?" and, if yes, (2) "does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?"  *Id.*  Here, both parties agree that the answer to the first question is yes, so the only disputed issue is whether the parties expected the Vessel to play a substantial role in completion of the Platform repair contract.

For a vessel to have a "substantial role," there must be a "direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat."  *Earnest*, 90 F.4th at 813 (citation omitted).  For example, "a contract to repair or to insure a ship is maritime, but a contract to build a ship is not."  *Id.* at 810.

"When work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract."  *Doiron*, 879 F.3d at 576 n.47.  The focus "should be on whether the contract calls for substantial work to be performed from a vessel."  *Id.* at 573.  This analysis "ignores the need for vessels to transport equipment and crew to the platform and considers only the other roles the vessels played."  *In re Crescent Energy Servs., L.L.C.*, 896 F.3d 350, 360 (5th Cir. 2018); *see also Doiron*, 879 F.3d at 576 n.47 (explaining that the substantial role "calculus would not include transportation to and from the job site").

Under this analysis, "the contracting parties' expectations are central." *Crescent*, 896 F.3d at 359.  This court focuses on the "contract and the expectations of the parties." *Doiron*, 879 F.3d at 576.  If the scope of a contract and the parties' expectations are "unclear, . . . courts may permit the parties to produce evidence of the work actually performed and the extent of vessel involvement in the job." *Id.* at 577.

### A

We first address the parties' contracts before turning to evidence of the parties' expectations.  Genesis and Danos cite three contracts that are relevant to the Platform repairs:  their Master Services Agreement; the "Job Plan," which memorializes an oral work order for the Platform repairs; and the Botruc Rental bid document.  The district court concluded that no contract established that the Platform-repair work would "involve a substantial role for the vessel."  We agree.

The Master Services Agreement, which predates Hurricane Laura by some 12 years, establishes only general terms and conditions for future projects like the Platform's repair and does not contemplate the use of a vessel.

The Job Plan, executed by Genesis and Danos representatives in preparation for the Platform repairs, provides the specifics for the project.  Under the Job Plan's "Scope of Work/Objective" section, the objective of the project was to "[m]ake [the] platform safe for riser de-oil operations and drain the CHOPS pig launcher and receiver."[2]  That "Scope" section lists

---

[2] A *pig* is a "mobile device that is placed within a Pipeline, and moves through the Pipeline, that can accomplish a number of tasks, including checking for any structural deficiencies or leaks in the Pipeline, cleaning the Pipeline, and/or acting as a flushing tool to move certain [natural gas liquids] and other Hydrocarbons through the Pipeline." *Pig,*

five steps to achieve the overarching objective: constructing a ladder, replacing grating, barricading handrails, inspecting fire extinguishers, and draining oil from the pig launcher and receiver.

The Job Plan also contains a "Detailed Procedure" section that expands on the foregoing and lists eleven additional steps with subparts to carry out the work, like performing safety walkthroughs, checking bolts on ladders, and connecting a nitrogen supply to the pig trap. This section of the Job Plan contains the only reference to the Vessel, stating that "crews will live on the vessel and transfer to the platform daily via man basket."

Finally, Genesis cites the bid document that Botruc Rental sent to Genesis. That document calls for the rental of the Vessel to Genesis for $12,000 per day. The only obligations included in the bid, aside from transporting the crew, are "Meals and Lodging: Included."

These contracts do not establish a "direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat." *Earnest*, 90 F.4th at 813. They establish at most that the Vessel would transfer and house the crew, but we have previously dismissed those uses as insufficient to establish a vessel's "substantial role." *See, e.g.*, *Crescent*, 896 F.3d at 360 (explaining that the substantial-role analysis "ignores the need for vessels to transport equipment and crew" (citing *Doiron*, 879 F.3d at 576 n.47)); *id.* at 361 (describing crew-quarter use as "incidental").

The district court did not err in concluding that the contracts do not establish a substantial role for the Vessel.

_____

Latham & Watkins, The Book of Jargon: Oil & Gas 80 (1st ed. 2016), *available at* https://www.lw.com/admin/upload/Documents/Oil_Gas_Book_of_Jargon.pdf.

No. 24-20357

B

We now turn to the parties' expectation evidence.[3]

Genesis primarily cites two largely identical declarations submitted by Danos and Genesis employees as evidence of the parties' expectations.[4] Both employees state that "at the time of contracting for the Platform repair work, both Danos and Genesis contemplated that the continuous use of the [Vessel] was necessary for Danos to complete its repair work." The declarations then list some functions for which the Vessel "was to be used." According to the declarations, both companies knew that the Vessel would be used for living quarters and a mess hall and that it would maintain a position alongside the Platform for the duration of repairs, which is consistent with the use of the Vessel revealed in the Botruc Rental bid. Each morning, personnel aboard the Vessel were to meet for daily safety meetings, and then the Platform's crane would transfer crewmembers from the Vessel to the Platform where they would work. The Vessel would also house necessary equipment and cargo that would be transferred to the Platform as needed, like non-potable water and diesel fuel that would power the Platform's crane, welding machines, and light racks.

_____

[3] The Botruc Rental bid document that Genesis cites does not shed much light on the "expectations of the parties," as only one of the relevant parties, Genesis, was a party to the bid document. *Doiran*, 879 F.3d at 576; *see also Matter of Offshore Oil Servs., Inc.*, 663 F. Supp. 3d 594, 615 (E.D. La. 2023) ("Courts have held the Fifth Circuit's 'expectations of the parties' standard requires there to be a *shared expectation* that a vessel would play a substantial role." (emphasis added)).

[4] Neither party's brief distinguishes between evidence of the parties' expectations of the contract and evidence of the Vessel's actual use. We "may permit" actual-use evidence only if the contract and parties' expectations are "unclear." *See Doiron*, 879 F.3d at 577. Consistent with *Doiron*, we discuss evidence of the parties' expectations separately from evidence of actual use, as did the district court.

The declarations describe this arrangement as "out of the norm." As they explain, the Vessel typically only transports and delivers cargo to platform-repair sites before departing back to shore. But because of the "extensive nature of the damage [to] the Platform," it was "necessary" to position the Vessel alongside the Platform for the duration of repairs. The declarations explain that this unique arrangement "was contemplated by both Danos and Genesis" at the time of contracting.

For its part, Danos cites deposition testimony of its corporate representative that Danos's "understanding was that [the Vessel] was providing the initial transportation and mobilization, and then the living quarters for the crew."

At the outset, we note that the declarations' description of the Vessel as "necessary" to the work is insufficient standing alone, because vessels are often necessary for offshore work. *See Crescent*, 896 F.3d at 361 ("A vessel's being indispensable may not equate to its role being 'substantial,' though."). Rather, Genesis must show that the parties anticipated that the Vessel would play a "substantial role in the completion of the contract" to repair the Platform. *Doiron*, 879 F.3d at 576.

Consistent with *Doiron*, our recent maritime-contract cases have turned, in large part, on whether the vessel in question is expected to directly aid the completion of the project. In *Crescent*, for example, we determined that a contract to plug and abandon three offshore wells was maritime. 896 F.3d at 352. The parties in that case had chartered three vessels, including a barge. *Id.* In its *Doiron* analysis, the *Crescent* court emphasized that "the contract anticipated" and the parties expected that the crew would use the barge for "its crane, the wireline unit, and other equipment that could not be moved onto a platform." *Id.* at 361. In the court's view, the "wireline

8

operation"[5] served as the "most important component of the work" that the crew performed. *Id.*  The wireline operation, which was "substantially controlled from the barge," comprised about 50% of the job. *Id.*  The panel ultimately held that the vessel's role was substantial, reasoning that, "What is important in the present case is that use of the wireline unit on the vessel was central to the entire [] contract." *Id.* at 361–62.

In another case, *Barrios v. Centaur, L.L.C.*, the parties contracted to build a concrete containment rail on a dock facility on the Mississippi River. 942 F.3d 670, 673–74 (5th Cir. 2019).  To perform that work, one party chartered a barge equipped with a crane. *Id.* at 674.  The crew used the barge as a "necessary work platform, an essential storage space for equipment and tools, and a flexible area for other endeavors related to the construction work." *Id.* at 681.

The court in *Barrios* concluded that the vessel's use was "substantial" in large part because the parties' contract contemplated the barge's crane being used to "mix the concrete and pour it for the concrete containment rail." *See id.* at 681 ("Far from being 'an insubstantial part of the job and not work the parties expected to be performed,' the proposal shows that the parties expected the barge to play a critically important role." (citation omitted)).  Further, "[j]ust as the proposal indicated," the crew used the barge as a work platform for purposes like "drilling holes, cutting rebar, and pouring forms." *Id.*  The court also noted the barge's ancillary uses, like serving as a space for "storing and packing tools, holding safety meetings,

---

[5] "A 'wireline' is a continuous cable used to perform various subsurface functions in a well, including the lowering and raising of various tools, instruments, and other devices." *Barrios v. Centaur, L.L.C.*, 942 F.3d 670, 677 n.4 (5th Cir. 2019) (quoting *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 371 (5th Cir. 2001)).  Wireline work is an "essential component of the drilling process." *Roberts v. Cardinal Servs., Inc.*, No. CV 99-430, 2000 WL 1300390, at *3 (E.D. La. 2000) (Clement, J.).

taking breaks, and eating lunch." *Id.* "That Centaur's workers may have worked on the dock a majority of the time [did not] alter" the conclusion that the barge was a "necessary work platform." *Id.* at 681–82.

In *Doiron* itself, on the other hand, the vessel's role was insubstantial. 879 F.3d at 577. There, the parties contracted to repair a gas well that was accessible only from a platform. *Id.* at 570, 577. After work began, the parties encountered an *unexpected* problem that required them to charter a crane barge to lift equipment onto the platform. *Id.* at 570. We concluded that "lift[ing] the equipment [onto the platform] was an insubstantial part of the job and not work the parties expected to be performed." *Id.* at 577.

Here, the employees' declarations that Genesis cites reveal an attenuated connection between the Vessel and the repair work because the Vessel only housed equipment, supplies, and tools, all of which was later transferred to the Platform where the crew then used them. This case is therefore like *Doiron*, where the vessel only transported "heavy equipment [that] was needed to complete the job" on the platform. 879 F.3d at 570. Further, this case is unlike *Barrios* and *Crescent* because this Vessel was not crane-equipped, and because the Danos crew was not expected to perform any Platform repairs from the Vessel or fabricate equipment on the Vessel. *Cf. also Quiroz v. C & G Welding, Inc.*, No. CV 16-15427, 2018 WL 6003554, at *4 (E.D. La. Nov. 15, 2018) (concluding that a contract involving a crane-equipped vessel was maritime). Rather, the Platform housed the crane, which Genesis personnel used to transfer items and personnel from the Vessel to the Platform, where all Platform-repair work would be performed.

To be sure, Genesis's declaration describes the Vessel as an "additional work platform," like in *Barrios*. But crucially, the declarations explain that that "work" consisted of pumping non-potable water and diesel fuel from the Vessel to the Platform to power the crane, welding machines,

and light racks—*i.e.*, transportation of supplies. The barge in *Barrios* on the other hand was a "necessary work platform" because it was a space for fabrication and construction, and it housed the crane, facts that are not present here. Viewing these facts in the light most favorable to Genesis, the parties anticipated that the Vessel would only house equipment that would later be transferred to the Platform, where it would facilitate repairs. That role is insubstantial. *Compare Doiron*, 879 F.3d at 577 (nonmaritime where crew worked on platform and only transferred equipment from vessel) *with Crescent*, 896 F.3d at 361 (maritime when vessel acted as a work platform due in large part to its housing of the wireline unit).[6]

Genesis argues that the court should decline to focus on the nature of the vessel-based work, citing *Earnest*, 90 F.4th at 813. In its view, that case shifted the court's focus to whether the vessel was "necessary to perform the job," meaning whether the "project would have been []possible without" a vessel.

*Earnest*, however, is factually distinguishable. In that case, the parties contracted to repair lifeboats (*i.e.*, vessels) located on a platform. 90 F.4th at 806. The district court concluded that the contract was not maritime

---

[6] In reaching this conclusion, we also rely on the thoughtful *Doiron* analyses of many of the learned district courts in this circuit. *See, e.g.*, *Matter of Offshore Oil Servs., Inc.*, 663 F. Supp. 3d at 614–15 (Morgan, J.) (nonmaritime when vessel was used for personnel and equipment transfer to platform); *Carr v. Yellowfin Marine Servs., LLC*, 423 F. Supp. 3d 316, 323 (E.D. La. 2019) (Ashe, J.) (nonmaritime when vessel only provided transportation of supplies, equipment, and personnel); *In re M/V Ram XVII*, No. 22-CV-0998, 2024 WL 5010472, at *3 (W.D. La. Dec. 6, 2024) (Hicks, J.) (maritime where parties' contract stated that the contract would be "performed . . . on vessels"); *Sanchez v. Am. Pollution Control Corp.*, 566 F. Supp. 3d 549, 556 (E.D. La. 2021) (Barbier, J.) (maritime when contract for oil-spill cleanup involved a vessel equipped with a boom that controlled the spread of spilled oil); *Mays v. C-Dive LLC*, No. CV 16-13139, 2018 WL 3642005, at *3 (E.D. La. Aug. 1, 2018) (Milazzo, J.) (maritime where SCUBA-diver-support vessel supported divers and housed crane to lower divers for pipeline repairs).

because these repairs took place on a platform. *Id.* at 813. We reversed, concluding that the object of the contract was to repair vessels, which "inevitably gives the vessel a substantial role." *Id.* at 813. *Doiron*, *Barrios*, and *Crescent* by contrast did not involve repairs to vessels. While *Earnest* mentioned "necessity" in its analysis, it observed that the focus on "use" and vessel-based work was "appropriate based on the facts in *Doiron*"—in other words, when a contract's object is to repair a platform. *Id.* at 813. So, when a contract involves platform (not vessel) repair, as here, the proper focus is on the "use" of the vessel for work, and "whether the contract calls for substantial work to be performed from a vessel." *Doiron*, 879 F.3d at 573.

Genesis also cites several of the Vessel's ancillary functions, such as housing the crew, serving as a space for meals and safety meetings, and transporting crew and materials to the Platform, in support of its argument that it had a substantial role. Such functions are legally insufficient. For example, we have generally described housing as merely an "incidental" role. *Crescent*, 896 F.3d at 350; *see also Quiroz.*, 2018 WL 6003554, at *4 (concluding that a contract was a maritime contract but noting that the vessel provided "incidental uses such as a place to house . . . workers"). Similarly, we have explained that a vessel's use for "transportation to and from the job site" is to be ignored, including the transportation of equipment. *Doiron*, 879 F.3d at 576 n.47; *Crescent*, 896 F.3d at 360 ("Our analysis of 'substantial' ignores the need for vessels to transport equipment and crew to the platform . . . ."); *see also Matter of Offshore Oil Servs., Inc.*, 663 F. Supp. 3d 594, 613–14 (E.D. La. 2023) ("To the extent [plaintiff] argues the 'loading and offloading' of items transported on vessels makes the use of those vessels substantial, and the Contract a maritime one, the Court disagrees."). While these ancillary functions may have facilitated the Platform repairs, *Doiron*

No. 24-20357

calls for a closer nexus between the Vessel and the project's work than these functions have.[7]

Genesis's proffered evidence therefore does not establish that the parties expected the Vessel to have a substantial role in completing the contract. Although the parties anticipated that the Vessel would perform some ancillary purposes like housing and transportation, those uses do not reveal that "substantial work [was] to be performed from" the Vessel. *Doiron*, 879 F.3d at 573.[8]

\* \* \*

Genesis and Danos contracted to repair the Platform. That Genesis also chartered the Vessel to facilitate those repairs does not transform this

_____

[7] Both parties also cite language from *Doiron* where the court discussed a "rule of thumb" used in Jones Act cases and its possible applicability to the substantial role analysis:

> A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.

*Doiron*, 879 F.3d at 576 n.47 (quoting *Chandris, Inc. v. Latsis*, 515 U.S. 347, 371 (1995)). In other words, if a crewmember services a vessel for more than 30% of the vessel's time in navigation, a contract pertaining to that crewmember may be maritime. This rule of thumb has no bearing here. The "in service of" language means that the crew must "contribute[] to the function and mission of the vessel." Wright & Miller, 14B Fed. Prac. & Proc. Juris. § 3678 (5th ed.) (collecting cases); *see also Becker v. Tidewater, Inc.*, 335 F.3d 376, 388 (5th Cir. 2003). Here, there is no indication that the parties anticipated that Danos personnel would service the Vessel; indeed, Genesis chartered the Vessel from a third-party, Botruc Rental, whose crew presumably serviced the Vessel for the duration of this work.

[8] Because the scope of the contract and the parties' expectations are not "unclear," we need not turn to the parties' evidence of how the Vessel was actually used. *Doiron*, 879 F.3d at 577; *Matter of Offshore Oil Servs., Inc.*, 663 F. Supp. 3d at 616 ("Because it is undisputed that IOC did not expect the vessel to play a substantial role in the completion of the work, the Court finds it unnecessary to examine the extent to which the vessel was used during the work.").

platform-repair contract into a maritime contract. While we acknowledge that the Vessel's role here was distinct from the typical role played by a vessel for offshore work, Genesis's summary judgment evidence does not show that the Vessel's role was "substantial," as it must under *Doiron* and as the district court ably explained. Genesis has therefore failed to carry its summary judgment burden, and we AFFIRM.